**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

TH:ML/DJM
F. #2025R00171

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 12, 2026

By ECF and E-Mail

The Honorable Marcia M. Henry
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Ousmane Diallo, et al.
Docket No. 26-CR-311 (RPK)

Dear Judge Henry:

The government respectfully submits this letter in support of its application for the entry of an order of detention pending trial for each of the three defendants charged in the above-referenced case. The defendants are all members and associates of the ICG Babiez, a subgroup, or "set," of the nationwide Insane Crip Gangsters ("ICG"), a violent street gang. As alleged in the indictment, on March 31, 2022, the defendants murdered Kade Lewin, a twelve-year-old boy, during a drive-by shooting in Brooklyn. A second bystander was also shot but survived her injuries.

For the reasons set forth more fully below, including the defendants' brazen and violent conduct, along with their criminal histories and the mandatory minimum sentences they face if convicted, the government submits that each of the defendants is both a flight risk and a danger to the community, and no combination of conditions can secure their appearance at trial and the safety of the community.

## I. The Defendants' Crimes

### A. Background

The government proffers the following facts concerning the offense conduct that is relevant to the defendants in this case. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (holding that the government may proceed by proffer in a detention hearing); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).

As set forth in the indictment, ICG is a nationwide street gang that operates in and around Brooklyn, New York, among other locations. The chapter of ICG in Brooklyn is also referred to as the ICG Babiez. ICG originated in Long Beach, California and specifically, on 23rd Street. The number "23" is a reference to ICG's origin street and block, and members and affiliates of the gang often use the number "23" to promote or reference ICG. Members and affiliates of ICG sometimes also signify their membership and allegiance to the gang by wearing the colors blue, black and grey, or using special hand signals that reference "2" or "3."

Here in Brooklyn, ICG Babiez members and associates have committed various acts of violence on behalf of the gang, including murder, attempted murder and assault, to protect their territory and promote the gang. Specifically, members and associates of the ICG Babiez have been involved in violent acts against, or intended for, members of rival gangs, including the Folk Nation Gangster Disciples ("GD") and 8 Trey Crips set, also based in Brooklyn. In particular, being a "shooter" gave you respect in the gang. The pattern of retaliatory violence has led to gang-related shootings that have plagued the Crown Heights and Flatbush neighborhoods in Brooklyn, among others, between 2019 and the present. ICG Babiez members also met regularly and were expected to contribute to a fund intended to be distributed to ICG Babiez members who were incarcerated. To financially support fellow gang members, members and associates of the ICG Babiez engaged in various types of fraud, including access device fraud.

Within the ICG Babiez, certain members are viewed as leaders who, among other things, influence others to commit acts of violence on behalf of the gang. Diallo was a long-time member and leader of the ICG Babiez. Each of the defendants flaunt their membership in and association with ICG and the ICG Babiez on their social media accounts and glorify participation in a violent street gang that inflicts terrible harm to our community.

In the present indictment, each defendant is charged with violent crimes in-aid-of racketeering ("VICAR"), including murder (Diallo and Bussereth) and assault (all defendants), in violation of 18 U.S.C. § 1959(a), as well as related firearms offenses, in connection with their commission of the March 31, 2022 murder discussed in detail herein.

B. The March 31, 2022 Murder of Kade Lewin

On March 31, 2022, the defendants engaged in a drive-by shooting at the intersection of East 56th Street and Linden Boulevard in East Flatbush, Brooklyn. The purpose of the drive-by shooting was to target an associate of a rival gang. However, the defendants misidentified the car that they believed the rival gang associate was in and instead shot into a car of innocent bystanders, killing a twelve-year-old boy, Kade Lewin, and striking a second passenger in the car.

As captured on video surveillance footage, at approximately 6:47 p.m. on March 31, 2022, Luc and another individual ("CC-1") exited an apartment unit within a residential building in Crown Heights (the "Crown Heights Apartment"), known to be a location used and frequented by ICG Babiez members and associates, and walked to a black Mercedes Benz sedan (the "Black Mercedes") parked in the vicinity of the building. Luc got into the backseat on the driver's side and CC-1 entered the front driver's side of the Black Mercedes. Within approximately one minute, Diallo and Bussereth also exited the Crown Heights Apartment and

got into the Black Mercedes. Images of CC-1 and Luc (left image) and Diallo and Bussereth (right image) exiting the Crown Heights Apartment are shown below.






Minutes later, the Black Mercedes left the area and drove eastbound in Brooklyn. Around 7:34 p.m., the Black Mercedes arrived in the vicinity of East 56th Street and Linden Boulevard—the location of the murder—as shown in the below image. Once in the area, the defendants drove in circles around the block multiple times.



At approximately 7:47 p.m., Diallo and Bussereth fired multiple gunshots from the Black Mercedes into a sedan parked on the side of the road. Multiple flashes consistent with muzzle flashes of a firearm around the sunroof and driver's side of the Black Mercedes were captured on video surveillance footage. The New York City Police Department's gun detection system, ShotSpotter, collected audio from approximately 11 gunshots fired in rapid succession around the same time. An image of the Black Mercedes during the drive-by shooting, with the vehicle circled in red and a muzzle flash circled in yellow, is shown below.



A twelve-year-old boy sitting in the front passenger seat of the sedan that the defendants fired into was struck in the head and chest. He died within 10 minutes. The defendants' gunfire also struck another bystander in the sedan multiple times, though she survived her injuries. An eight-year-old girl sitting in the sedan was unharmed.

After the shooting, the Black Mercedes was captured on surveillance footage driving away from the scene and parking in the Prospect Lefferts Garden neighborhood of Brooklyn at approximately 7:50 p.m. The defendants got out of the vehicle a few minutes later and, around 8:31 p.m., were picked up by a white sedan that delivered them back to the Crown Heights Apartment.

Video surveillance footage captured the defendants entering the lobby of the Crown Heights Apartment building in Brooklyn, as shown in the images below. Each of the defendants appeared to have their heads and faces covered in a concerted effort to hide their faces from being identified on the surveillance cameras. The defendants then entered the Crown Heights Apartment.







Though the defendants had their faces covered when returning to the Crown Heights Apartment after the murder, each defendant was captured on video surveillance in the hours before or after the murder wearing the same clothing as during the murder but with their faces visible. For example, at approximately 10:15 a.m. on the day of the murder, Diallo was captured on video surveillance parking the Black Mercedes and standing outside of the Crown Heights Apartment building wearing the same dark-colored jacket and white and grey shoes that he wore during the murder, as shown in the images below.





Later that afternoon, at about 3:30 p.m., Luc was depicted on video surveillance getting out of the Black Mercedes at a deli in Brooklyn while wearing the same dark-colored puffer jacket with a grey sweatshirt that he wore during the murder. An image of Luc at the deli is shown below. After purchasing items, Luc returned to the Black Mercedes.



Additionally, about 47 minutes after the defendants returned to the Crown Heights Apartment after the murder, Bussereth was depicted on video surveillance exiting the Crown Heights Apartment wearing the same grey sweatpants, grey sweatshirt, black jacket and black and red sneakers that he was wearing during the murder but with his hood down, as shown on the image left below. Bussereth was then depicted walking down the block to his residence after which he was depicted wearing new clothes, as shown in the right image below. After changing clothes, Bussereth returned to the Crown Heights Apartment.





In addition to the video surveillance capturing the defendants before, during, and after the murder, cell phone location data for phones believed to be used by the defendants places each of the defendants at locations consistent with the video surveillance. Specifically, cell-site location data for the cellular phones believed to be used by Diallo and Luc places them in the vicinity of East 56th Street and Linden Boulevard, where the murder occurred, around the time of the murder. Cell-site location data for the phone believed to be used by Luc also places him in the vicinity of the Crown Heights Apartment around the time that he and the other defendants were seen exiting the apartment and going to the Black Mercedes. Cell-site location data for the

phone believed to be used by Luc, and tower dump records for a phone believed to be used by Bussereth, places both of them in the vicinity of where the defendants parked the Black Mercedes after the shooting.

Additionally, Luc admitted to law enforcement that he was present inside the Black Mercedes at the time of the murder.

For this conduct, defendants Diallo and Bussereth are each charged in the indictment with one count of murder in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Count One). All defendants are charged with one count of assault in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3) (Count Two); one count of possessing, brandishing and discharging a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii) and (iii) (Count Three); and one count of causing the death of Kade Lewin through the use of a firearm, in violation of 18 U.S.C. § 924(j)(1) (Count Four). If convicted of these crimes, Diallo and Bussereth face a mandatory sentence of life imprisonment or death. Luc faces a minimum sentence of 10 years' imprisonment and a maximum sentence of life imprisonment or death.

## II. The Defendants' Criminal Histories and Additional Relevant Information

### A. Ousmane Diallo

Diallo's criminal history reflects a series of violent and reckless conduct. For instance, on December 16, 2021, Diallo pleaded guilty to first degree robbery as a youthful offender. Diallo was sentenced on February 8, 2022 to three years' probation. Less than two months later, he committed the instant offense.

On June 25, 2025, Diallo pleaded guilty to two counts of attempted murder: intention, a Class B felony, in violation of N.Y. Penal Law § 125.25(1), for two separate shootings committed on January 27, 2022 and March 7, 2023 in Brooklyn. The first shooting involved Diallo attempting to murder a member of GD, a rival gang, on January 27, 2022 in Brooklyn. As seen in the still image below from video surveillance cameras, Diallo is depicted in the bottom right-hand corner of the image chasing the victim with an extended arm holding a firearm. The victim was shot twice but survived his injuries.



Diallo was sentenced on September 17, 2025 to 14 years' imprisonment and five years' post-release supervision for these two attempted murders. He is currently in New York State custody at Five Points Correctional Facility in Romulus, New York. He will be eligible for parole in November 2033.

B. Mayel Bussereth

Bussereth's criminal history indicates his dangerousness and involvement with firearms. On March 22, 2018, Bussereth pleaded guilty to petit larceny, a Class A misdemeanor, in violation of N.Y. Penal Law § 155.25 in Brooklyn. Bussereth was sentenced on June 7, 2021 to time served. While Bussereth's state case was pending, he was subject to multiple bench warrants.

On December 12, 2020, Bussereth was arrested in Brooklyn for smoking marijuana and, upon further investigation, he was found to be in possession of a loaded firearm. On August 3, 2022, Bussereth pleaded guilty to criminal possession of a firearm, a Class E felony, in violation of N.Y. Penal Law § 265.01-B(1). He was sentenced on September 30, 2022 to 364 days' imprisonment.

Bussereth also continues to be in contact with ICG Babiez members and associates. For example, based on a review of toll records obtained from T-Mobile, between March and October 2026, Bussereth contacted a fellow gang member over 140 times.

C. Jonah Luc

Luc's criminal history is set forth in a detention memorandum the government submitted on August 22, 2025 in connection with Luc's prosecution for theft of government funds and identity theft. This memorandum is attached as Exhibit A.

As relevant here, on October 28, 2022, Luc was charged with robbery by force, aggravated assault and employing juveniles in the commission of a crime, among other charges, in connection with a robbery at a Home Depot in New Jersey. On January 18, 2023, he pleaded guilty to conspiracy to engage in a crime, a felony, in violation of New Jersey Criminal Code 2C:5-2A(1) and shoplifting, in violation of New Jersey Criminal Code 2C:20-11B(1) in the Superior Court of New Jersey, Middlesex County. He was sentenced on April 28, 2023 to a probationary term of three years.

Despite being on probation, Luc continued to promote and engage in criminal activity as evidenced in his social media posts, which showed him with firearms and soliciting co-conspirators for "scamming" crimes, among other things. For example, on July 11, 2024, Luc posted a story of himself and another masked individual holding handguns, as depicted below. Notably, the firearm in the defendant's hand has a blue laser sight, and he is pointing the barrel of the gun towards the camera.



On August 22, 2025, Luc was arrested and charged by complaint with theft of government funds, in violation of 18 U.S.C. § 641, and aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1) and 1028A(c)(4). See United States v. Jonah Luc, No. 25-MJ-253 (E.D.N.Y.). Later that day, Luc was arraigned before Chief U.S. Magistrate Judge Vera M. Scanlon. Chief Judge Scanlon remanded Luc pending trial given, among other things, his involvement in the instant offense, his commission of the charged federal crimes while on state probation, and the fact that his state conviction involved minors in the commission of the crime.

On September 4, 2025, a grand jury sitting in the Eastern District of New York returned an indictment charging Luc with theft of government funds, in violation of 18 U.S.C. § 641 (Count One), and aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), 1028A(b) and 1028A(c)(1) (Count Two). See United States v. Jonah Luc, No. 25-CR-273 (NCM) (E.D.N.Y.).

On June 2, 2026, Luc was convicted at trial of all charges.[1] On September 2, 2026, Luc moved for release pending sentencing. Your Honor denied his motion for release. The defendant appealed to Judge Merle who granted Luc's request for bail pending sentencing, which is now scheduled for January 6, 2027. However, given that Luc was resentenced to three years' imprisonment for a probation violation related to his New Jersey state conviction, he was transferred to New Jersey state custody where he is currently serving his term of incarceration.

## III. Legal Standard

The court "shall order" a defendant detained if it finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The government

---

[1] On August 28, 2026, U.S. District Judge Natasha C. Merle overturned the jury's verdict as to Count Two.

bears the burden of persuading the court by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). In cases such as this, however, where there is probable cause to believe a defendant has violated 18 U.S.C. § 924(c), there is a statutory presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(B). Even if a defendant can overcome that presumption, the special risk of dangerousness posed by defendants who have committed such crimes "remains a factor to be considered among those weighed by the district court." Mercedes, 254 F.3d at 436.

As noted above, the government may proceed by proffer to establish facts relevant to a detention determination. Ferranti, 66 F.3d at 541. Furthermore, "[t]he rules of evidence do not apply in a detention hearing." Id. at 542. As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination. Most proceed on proffers. See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, "including whether the offense is a crime of violence . . . or involves a . . . firearm"; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including "whether, at the time of the current offense or arrest, the person was on probation [or] on parole"; and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g). Specifically, in evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

## IV. Argument

### A. The Defendants are Eligible for Detention Under Section 3142(f)

The defendants are facing VICAR charges, including second-degree intentional murder predicated on violations of N.Y. Penal Law § 125.25(1) (Diallo and Bussereth), and assault predicated on violations of N.Y. Penal Law §§ 120.05(2) and 120.05(1) (all defendants). There is little doubt that this conduct qualifies as "crime[s] of violence" under the Bail Reform

Act. Cf. United States v. Davis, 74 F.4th 50, 56 (2d Cir. 2023) (finding that defendant's "conviction for VICAR murder, predicated on second-degree intentional murder under N.Y. Penal Law § 125.25(1), categorically qualifies as a crime of violence under § 924(c)"); United States v. Morris, 61 F.4th 311, 320 (2d Cir. 2023) (holding that VICAR assault with a dangerous weapon premised on violations of either N.Y. Penal Law §§ 120.05(2) or 120.10(1) are crimes of violence that can support a conviction under 18 U.S.C. § 924(c)). The defendants also face a maximum sentence of life imprisonment or death, see 18 U.S.C. §§ 924(j)(1), 1959(a)(1) and the case relates to felonies involving the possession or use of firearms. Thus, the defendants are eligible for detention under the Bail Reform Act. See 18 U.S.C. §§ 3142(f)(1)(A), (B), (E).

B. Detention is Warranted

No bail package will protect the community from the danger posed by the defendants. Each of the four factors set forth in Section 3142(g) militate in favor of their pretrial detention, and as to all defendants, there is a statutory presumption that the defendants pose a danger and a risk of flight.

First, as the Second Circuit has recognized, "certain types of crimes," including those brought pursuant to Section 924(c), which is charged in the Indictment, "warrant particular consideration under the rubric of the 'nature and circumstances of the offense charged.'" United States v. Zhang, 55 F.4th 141, 149 (2d Cir. 2022). Here, all the defendants are charged with crimes of violence and crimes that "involve[] a . . . firearm." 18 U.S.C. § 3142(g)(1). The violent conduct charged in the Indictment—murder, assault, and firearms offenses—involved a premeditated shooting into a parked car with the intention of murdering an associate of a rival gang. Instead, the defendants struck Kade Lewin, an innocent twelve-year-old boy, in the head and chest with multiple gunshots. They also shot a second bystander in the car multiple times, causing her to be hospitalized. This devastating violence demonstrates the severe danger these defendants pose. See United States v. Williams, No. 20-CR-293 (WFK), 2020 WL 4719982, at *2 (E.D.N.Y. Aug. 13, 2020) (holding magistrate judge erred in releasing on bail defendant who possessed a firearm in connection with an allegedly gang-motivated shooting); see also United States v. Destine, No. 20-CR-293 (WFK), 2022 WL 2181453, at *2-3 (E.D.N.Y. June 16, 2022) (finding nature of offense weighed against release for GD member charged with driving a decoy car during a shooting); United States v. Waddell, et al., No. 24-CR-351 (LDH) (E.D.N.Y.) (detaining all six defendants involved in violent gang-motivated drive-by shooting on June 19, 2022 in Brooklyn).

Second, the weight of the evidence against the defendants is overwhelming, giving them a strong incentive to flee. See United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022) (where the evidence of a defendant's guilt is strong, "it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight"); United States v. Sabhnani, 493 F.3d 63, 76 (2d Cir. 2007) (finding detention appropriate because, in part, "the evidence of [the defendants'] guilt, both direct and circumstantial, appears strong"). As described above, law enforcement collected hours of surveillance video in Brooklyn, New York, which depicted the movement of the Black Mercedes throughout the day of March 31, 2022. This included videos of the defendants exiting the Crown Heights Apartment, traveling to the East Flatbush neighborhood, circling the block multiple times, and then committing the shooting in the vicinity of East 56th Street and Linden

Boulevard. The video footage then depicted the defendants parking the Black Mercedes in the Prospect Lefferts Gardens neighborhood, being picked up by a white sedan, and traveling back to the Crown Heights Apartment. Notably, all the defendants are identifiable through the collection of these videos. In addition, historical cell-site data and tower dump records connect cellular phones believed to be used by the defendants to the vicinity of the murder and/or where the Black Mercedes parked. Luc has also admitted to law enforcement that he was present inside the Black Mercedes at the time of the above-described murder.

Moreover, if convicted at trial, Diallo and Bussereth face a mandatory sentence of life imprisonment or death. Luc faces a minimum sentence of 10 years' imprisonment and a maximum sentence of life imprisonment or death. The government currently estimates that, for purposes of the United States Sentencing Guidelines (the "Guidelines"), each defendant faces a Guidelines sentence of life imprisonment. The likelihood of a lengthy term of imprisonment for each defendant gives them a strong incentive to flee and greatly minimizes any risk that pre-trial detention would result in an over-served sentence. <u>See</u> <u>Destine</u>, 2022 WL 2181453, at *3 ("Further, if convicted, Defendant faces a mandatory minimum sentence of ten (10) years of incarceration and a maximum sentence of life. The likelihood of a lengthy sentence gives Defendant a strong incentive to flee.").

Courts have recognized that even a significantly shorter potential sentence can warrant a risk-of-flight finding. <u>See</u> <u>United States v. Scali</u>, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that Scali's Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee."); <u>United States v. Khusanov</u>, 731 F. App'x 19, 21 (2d Cir. 2018) ("[E]ven if, as a practical matter, Khusanov's maximum sentence exposure were only 15, rather than 30, years' imprisonment, that would still be sufficient to provide him with a strong incentive to flee."); <u>Williams</u>, 2020 WL 4719982, at *2 (Guidelines range of "92 to 115 months' imprisonment" gave defendant "a strong incentive to flee"); <u>United States v. Bruno</u>, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long a defendant has stronger motives to flee.").

<u>Third</u>, the defendants' history and characteristics weigh heavily in favor of detention. The defendants are each active members and associates of a violent street gang, some of whom committed the charged crimes while on parole or pre-trial release, including Diallo and Bussereth. <u>See</u> <u>Williams</u>, 2020 WL 4719982, at *3 (defendant's membership in gang and commission of offense while on parole weighed against release). Notably, Diallo was on probation at the time of the murder after pleading guilty to first degree robbery. He also pleaded guilty to two separate attempted murders in Brooklyn, one of which occurred two months before the March 31, 2022 murder and the second of which occurred approximately a year later. As noted above, he was sentenced to 14 years' imprisonment and is currently incarcerated. At the time of the March 31, 2022 murder, Bussereth was on pre-trial release from a firearms case in Brooklyn and ultimately pleaded guilty to possessing a loaded firearm. Bussereth also has a history of receiving bench warrants. And while Luc did not have any convictions at the time of the March 31, 2022 murder, he pleaded guilty in January 2023 for his involvement in a shoplifting conspiracy in New Jersey, was convicted at trial in June 2026 of theft of government funds in this District, and was resentenced to a term of three years' imprisonment for a probation

violation related to his federal conviction. Those histories demonstrate that the defendants pose an unacceptable risk to the community if they were to be released.

Fourth, the risk of further violence and flight by the defendants is severe. Courts have consistently held that where a defendant is associated with a violent criminal organization, no conditions—even stringent conditions of home confinement—are sufficient to protect the community. See United States v. Irizzary, No. 17-CR-283 (LAP), 2020 WL 1705424, at *3 (S.D.N.Y. Apr. 8, 2020) ("Even under normal conditions, electronic monitoring does not suffice to restrain violent criminals who, like [the defendant], are members of organized gangs."); United States v. Choudhry, 941 F. Supp. 2d 347, 359 (E.D.N.Y. 2013) ("It is well established that home detention and electronic monitoring may be insufficient to protect the community against dangerous individuals, particularly where those individuals have the ability to command others to do their bidding."); United States v. Gotti, 219 F. Supp. 2d 296, 299 (E.D.N.Y. 2002) ("In circumstances where the government has demonstrated that a defendant is a leader of an organized crime family, the Second Circuit has uniformly held that the defendant is dangerous because inherent in the leadership position is the supervision of criminal activity that cannot be curtailed by any condition or combination of conditions of release."), aff'd sub nom. United States v. Ciccone, 312 F.3d 535 (2d Cir. 2002).[2]

Accordingly, the § 3142(g) factors each compel detention in this case, demonstrating that the defendants cannot be released without risking the safety of the community and the likelihood that they will not return to court as required. That is especially true in light of the statutory presumption—that the defendants cannot overcome—that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(B). The defendants should therefore be detained.

## V. Conclusion

For the reasons set forth above, the government respectfully submits that no condition or combination of conditions will properly assure the safety of the community or the

[2] See also United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology"); accord United States v. Brennerman, 705 F. App'x 13, 16 (2d Cir. 2017); United States v. Dono, 275 F. App'x 35, 37 (2d Cir. 2008); United States v. Kelly, No. 19-CR-286 (AMD), 2020 WL 2528922, at *3 (E.D.N.Y. May 15, 2020) ("Nor are the defendant's proposed measures—that he be kept on home confinement and monitored by pretrial services—sufficient to eliminate the danger to the community.").

defendants' return to court if the defendants are released on bail, and therefore requests that the Court order that the defendants be detained.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Irisa Chen
Megan Larkin
Daniel J. Marcus
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of the Court (RPK) (by ECF)
Counsel of Record (by ECF)